[No. 7579.   Decided April 19, 1909.]

SPRINGFIELD SHINGLE COMPANY, *Respondent*, v. EDGECOMB MILL COMPANY, *Appellant*.[1]

APPEARANCE—WHAT CONSTITUTES—ANSWER.   An answer reciting that "now comes the defendant" and alleging facts as a "full and complete and affirmative defense," constitutes a general appearance.

APPEAL—REVIEW—PROCESS—WAIVER OF SERVICE BY GENERAL APPEARANCE.   Error assigned on the denial of a motion to quash service of a summons, is waived by a general appearance and pleading over to the merits.

APPEAL—PRESERVATION OF GROUNDS—AMENDMENT OF PLEADINGS—OBJECTIONS.   Error cannot be predicated upon a verbal amendment to the complaint read into the record at the opening of the trial, allowing a larger recovery, where no objection was made in the court below.

APPEAL—REVIEW—HARMLESS ERROR—EVIDENCE.   Error on the admission of evidence is harmless on a trial *de novo* on appeal.

APPEAL—REVIEW—FINDINGS.   The findings of the trial judge upon evidence that is very conflicting will seldom be disturbed on appeal, where he had opportunities of determining the credibility of the witnesses not possessed by the appellate court.

SALES—QUALITY—EVIDENCE—SUFFICIENCY.   Findings that shingles were sold as of "Star A Star" grade, are sustained where the parties contradicted each other, but they were branded, shipped and billed as such, and the price paid was the then ruling market price for that grade.

SALES—DAMAGES—CONDITION BROKEN—QUALITY—CAVEAT EMPTOR. The principle of caveat emptor does not apply where shingles are sold as "Star A Star," a grade well known to the trade and by custom conforming to certain specifications; and if not up to grade, the vendee may recover his damages, as for condition broken, although he inspected or had opportunity to inspect them before the sale.

Appeal from a judgment of the superior court for Snohomish county, Black, J., entered May 4, 1908, upon findings in favor of the plaintiff, in an action for damages for

[1]Reported in 101 Pac. 233.

condition broken as to the quality of shingles sold and de-
livered by the defendant. Affirmed.

*Merrick & Mills,* for appellant.

*J. Y. Kennedy* and *Hathaway & Alston,* for respondent.

MORRIS, J.—This action was commenced to recover dam-
ages claimed to have been sustained in the sale of a quantity
of shingles. The defendant was served by publication, fol-
lowing the usual return of "not found," and affidavit of "non-
residence." Thereafter the defendant, appearing specially,
moved to quash the service, which motion was, on February
13, 1908, denied, and on February 20, defendant filed its
answer. The first error assigned is the denial of the motion
to quash the service.

The answer reads, in part, as follows: "Now comes the
defendant above named and, for answer to the complaint of
the plaintiff above named,  .   .   . " The answer then
proceeds to frame an issue by denying the allegations of the
complaint, and continues: "and for a full and complete and
affirmative defense to all the matters and things in said plain-
tiff's complaint set out, this defendant avers.  .  :  ." This
answer was an undoubted general appearance and plea to the
merits. Appellant, having submitted itself to the jurisdiction
of the court, and formally entered its plea to the merits, can-
not now be heard to question the character of the service upon
it.

The respondent having replied to the answer, the case was
in due time called for trial before the court without a jury;
whereupon counsel for respondent thus addressed the court:
"We desire to amend paragraph VII of the complaint to
read as follows." The amendment was then read into the
record *in haec verba.* No objection was made by appellant,
and no ruling appears to have been made by the court. Coun-
sel for respondent called his first witnesses, and the case pro-
ceeded. Paragraph VII of the complaint alleged the value
of the shingles delivered to respondent as $1.30 per thousand;

the amendment alleged the value to be seventy cents per thousand, so that the purpose and effect of the amendment was to lessen the value of the shingles delivered and increase the damages, if any, sustained by respondent. The court, in its findings of fact, fixed the value of the shingles at eighty cents per thousand, and gave judgment to respondent in the sum of $664.88, which was a larger sum than the damages demanded in the original complaint, in which the value was fixed at $1.30 per thousand, making the damages correspondingly less. It is apparent from the record that all parties treated the amendment as duly made. Respondent now assigns error in this connection. Respondent, having made no objection in the court below, can make none here, and will be held to have waived any objection to the amendment as proposed. Objections to be available upon appeal must be well and seasonably made to the trial court; so that the error, if any, may be corrected in the first instance.

Next we have assignments of error growing out of admission of evidence. "Whether erroneous evidence has been admitted is not very material, since the court will disregard it and review the facts upon the evidence legitimately within the record." *Carney v. Vogel, ante* p. 571, 100 Pac. 1027.

We now come to the assignment of error upon which appellant most strongly relies. As before intimated, the action was one to recover damages upon the sale and delivery of certain shingles. The complaint proceeds upon the theory that the appellant was the owner of a quantity of cedar shingles, known to the trade as "Star A Star;" that the appellant sold, and the respondent purchased and paid for, these shingles as "Star A Star" shingles, at the then market price of $2.95 per thousand; that the appellant warranted the shingles to be of the aforesaid grade, and the respondent, relying upon such warranty, purchased them for the then market price of shingles of that brand or grade; that the shingles so sold were not "Star A Star," but turned out to be an inferior grade of much less value, not worth to

exceed (as amended) seventy cents per thousand.   These allegations were denied by appellant in its answer, and it was affirmatively alleged that no representations were made as to the quality or grade of the shingles, and that respondent purchased after inspection.   Thus it will be seen that the real issue before the court was whether the sale was made upon a condition in the nature of a warranty, or whether the principle of *caveat emptor* applies.   The court found for the plaintiff, and defendant appeals.

It appears from the evidence, and the court found, that "Star A Star" was a brand of shingles of superior grade, generally manufactured in this state, and that it was a custom established among shingle manufacturers to have such shingles conform to certain specifications, and that when shingles were stamped and packed as "Star A Star," such label indicated that the shingles came up to and fully met the specifications required.   Mr. Gampp, manager of the respondent, testified that, on August 20, 1907, he went to Edgecomb to purchase shingles; that he there saw Mr. Gray and Mr. Kinnear, officers of the defendant company, and purchased from them a car load of "Star A Star" shingles, at $2.95 per thousand, his company to receive the underweight, which was then estimated at ten cents per thousand; that he did not examine the shingles, except that he and Mr. Gray went out to the car which was then being loaded, and took out two or three bunches to weigh them for the purpose of ascertaining the probable underweight; that when he first saw Mr. Gray, he said to him that he wanted to buy a car of "Star A Star" shingles, and that Gray replied "they had some to sell;" that nothing more was said as to the grade of the shingles, and the only other conversation was as to the price, underweight, and shipping directions.   Mr. Kinnear testified that Gampp inquired as to the grade of the shingles, and that he was told "to go out and examine them;" that he did examine them, and said they were all right.   He further testified:

"Q. What kind of shingles did you make in that mill? A. Star A Star. . . . Q. How did the shingles in the car you sold Gampp compare as to quality with the average red cedar shingles manufactured here on the Sound under the brand 'Star A Star' shingles? A. They averaged very favorably with any that is manufactured."

Mr. Gray testified: "Q. What were those shingles as to grade? A. The kind? Q. Yes, sir. A. They were Star A Star shingles;" and that, when Gampp suggested the shingles might not be up to grade, "I says, we will go out and inspect them;" and that Gampp did go out and examine them.

Mr. Kuhn, a witness for appellant, testified he heard the conversation between Gampp, Kinnear and Gray, and that "there was nothing said about the grade or quality in my hearing." It will thus be noted that the evidence was very conflicting as to the conversation relative to the grade of shingles. This court has, however, frequently said in such cases that the trial judge, having seen the witnesses, noted their demeanor upon the stand, and being in a position to apply other rules and tests for determining the credibility of witnesses, his findings based upon such evidence will seldom be disturbed. We, therefore, approach the determination of the legal question involved herein with the finding that the shingles were sold and purchased as "Star A Star" shingles. We are further strengthened in this view by the testimony of both Kinnear and Gray, that the shingles were "Star A Star;" that they were branded, shipped and billed as such, and that the price asked and obtained was the then ruling market price for "Star A Star" shingles. It would not require a very vivid imagination under these circumstances to hold that they were sold as "Star A Star."

There was, as we have seen, no express warranty of quality, and it is contended by appellant that there could be no implied warranty in that respondent had an opportunity to inspect the shingles and that the maxim *"caveat emptor"* applies, and cites as its main reliance for the application of a

like rule here, the cases of *Swett v. Colgate*, 20 Johns. (N. Y.) 196, 11 Am. Dec. 266, and *Seixas v. Woods*, 2 Caines (N. Y.) 48, 2 Am. Dec. 215. *Swett v. Colgate* was a sale at auction of goods advertised and sold as *barilla*, when in fact it was *kelp*, a much inferior article; and the court held there was neither express warranty nor fraud, and the principle of *caveat emptor* applied; following the case of *Seixas v. Woods*, which was a case where wood was advertised and sold as *braziletto*. The agent of the vendee saw the wood, but it turned out to be an inferior wood, known to the trade as *peachum*, and *caveat emptor* was applied. These are the strongest cases cited in appellant's brief. Other cases are referred to, but they are cases coming within the undoubted rule of *caveat emptor*, and are in no wise analogous. These two cases, as we shall hereafter see, have both been criticized by the New York court, and are not now regarded as authority in that state.

There can be no question of *caveat emptor* in this case, for the reason that this rule applies where it is sought to enforce an implied warranty of quality or soundness, and the buyer has had opportunity of inspection. It is not claimed that there was any implied warranty of quality in the case at bar. The action is not brought upon any theory that the shingles were not good, sound, merchantable shingles, or that the timber in them was dead, rotten, or of any other unsound quality. But the theory of this case is that the sale of an article as being of a particular description does imply a contract that the article sold is of that description, a doctrine that is supported by abundant authority, both in this country and in England; and this rule is founded, not upon any theory of warranty, either express or implied, but rather upon the theory of condition broken; and if the action be one brought by the vendor to recover the price of the article sold, the tender of an article answering the description is a condition precedent to the recovery; and if this condition be not performed, the vendee is entitled to reject the article, or

if he has paid for it, to recover back his money. An examination of the English cases creates some confusion, because of the inapt use of the term "warranty" in this connection. Lord Abinger, in the case of *Chanter v. Hopkins*, 4 M. & W. 399, in speaking of this complexity, says:

"A good deal of confusion has arisen in many of the cases on this subject, from the unfortunate use made of the word 'warranty.' Two things have been confounded together. A warranty is an express or implied statement of something which a party undertakes shall be part of a contract; and though part of the contract, yet collateral to the express object of it. But in many of the cases, some of which have been referred to, the circumstance of a party selling a particular thing by its proper description, has been called a warranty, and the breach of such a contract, a breach of warranty; but it would be better to distinguish such cases as a noncompliance with a contract which a party has engaged to fulfill."

That the same perplexity exists in the American cases is referred to by Mr. Chief Justice Peters, in *Morse v. Moore*, 83 Me. 473, 22 Atl. 362, 23 Am. St. 783, 13 L. R. A. 224, in saying:

"That there is a warranty or a condition precedent amounting to warranty in the contract, there can be no doubt. Such a warranty will be found to be variously characterized in the books, as executory warranty,—a condition precedent amounting to warranty,—in the nature of warranty,—with the effect of warranty,—equal to warranty, and the like. It is immaterial for present purpose whether it be regarded as an express warranty or an express condition implying warranty, as the effect must be the same. One kind within its limit is not a more potential ingredient in a contract than the other, the difference between them being only in the style of agreement to which they may be annexed. An express warranty may be also special, however. It is now well settled by the authorities generally, our own cases included, that a sale of goods by a particular description of quality imports a warranty that the goods are or shall be of that description; a warranty which becomes a part of the contract."

In this case the contract called for "good, clear, merchantable ice," and it was held to be a sale of a particular description or kind of ice, amounting to an express warranty.

Before reviewing other American cases, reference will be made to a few of the English cases in which the rule here contended for has been announced. In *Tye v. Fynmore*, 3 Camp. 462, the article was sold as "fair, merchantable sassafras wood." The defense was that the sassafras wood delivered was part of the timber, while in the trade, by the description made use of, was meant the roots of the sassafras tree. It further appeared that the buyer was a druggist well skilled in matters of this sort; that the day before the contract was entered into a specimen of the wood was exhibited to him; and that he had a full opportunity to examine it. Lord Ellenborough held that it was not a sale by sample; the question was whether it was in the understanding of the trade "fair, merchantable sassafras wood;" and that it was immaterial that the buyer was a druggist and skilled in medicinal woods. He was not bound to exercise his skill, but could rely upon the contract as to the quality of the commodity.

So, in the case before us, it was shown that "Star A Star" was a well defined term when applied to shingles; that it meant shingles not only of a certain quality or grade, but of fixed dimensions, and that the term was well understood among shingle men. The respondent, although shown to have been familiar with the different grading of shingles and to have inspected some of the bunches, was, in the language of Lord Ellenborough, "not bound to exercise his skill, having an express contract from the vendor as to the quality of the commodity."

In the case of *Bridge v. Wain*, 1 Stark. 504, the goods sold were described in the invoice as "scarlet cuttings." The evidence showed the term "scarlet cuttings" was understood in the trade to mean cuttings of cloth only, without any mix-

ture of other material.   No special warranty was claimed.
Lord Ellenborough said:

"If they were sold by the name of scarlet cuttings, and
were so described in the invoice, an undertaking that they
were such must be inferred.   To satisfy an allegation, that
they were warranted to be of any particular quality, proof
must be given of such a warranty, but a warranty is implied
that they were that for which they were sold."

In the case before us, the shingles were billed to Gampp as
"Extra Star A Star red cedar Shgs.," and in the bill of lad-
ing the description was "1239 pkg. Shingles E. Star A Star
red cedar."   It would seem that, being billed and shipped as
"Star A Star," it would imply the same condition as in the
case just quoted from; that they were sold as "Star A Star,"
and were that for which they were sold.

In *Shepherd v. Kain,* 5 B. & Ald. 240, a ship was adver-
tised for sale as "a copper fastened vessel to be taken with
all faults, without any allowance for any defects whatso-
ever."   Held, that the seller would not be responsible for any
faults or defects which a copper fastened vessel might have,
but that it must be as described—"a copper fastened vessel."

In *Mader v. Jones,* 1 Russell & Chesley (Nova Scotia) 82,
a quantity of fish, packed in barrels branded "Gulf Herring
split No. 1," were sold.   Before purchasing, the buyer opened
and examined a few barrels.   The evidence showed the fish
did not correspond with the brand.   Held: "Where goods
are sold under a certain denomination, the buyer is entitled
to have such goods delivered to him as are commercially known
under this denomination, though he may have bought after
inspection of the bulk and without warranty;" citing *Jos-
ling v. Kingsford,* 13 C. B. (N. S.) 447, and Addison on
Contracts (ed. of 1869), p. 211.

Referring now to the New York cases, we shall see, as be-
fore intimated, that the cases of *Seixas v. Woods, supra,* and
*Swett v. Colgate, supra,* upon which appellant most strongly
relies, are not now recognized as announcing the true doc-

trine in that state. The first case criticising the rule laid down in those two cases is *Hawkins v. Pemberton,* 51 N. Y. 198, 10 Am. Rep. 595, where the article was sold at auction, as "blue vitriol." It turned out to be "salzburger vitriol," a much inferior grade. It was held that the offering for sale as "blue vitriol" constituted a warranty. Earl, C., in delivering the opinion of the court, says:

"The case of *Seixas v. Woods* (2 Caines 48) seems to have been decided mainly upon the authority of *Chandelor v. Lopus* (Cro. Jac., 4). . . . The rule, as thus laid down, has been thoroughly overturned since the courts hold that any positive affirmation or representation as to the character or quality of an article sold may constitute a warranty. The case has been much questioned, and can no longer be regarded as authority for the precise point decided [citing 2 Kent's Com. (Comstock's ed), 683, and other cases.]. . . The case of *Swett v. Colgate* (20 John., 196) is quite analogous to the case of *Seixas v. Woods,* and was decided mainly upon the authority of that case. . . . but in view of the rules of law, as now settled in this and other states, I am of opinion that the law was not properly applied to the facts."

The point was next before the New York court in the case of *Dounce v. Dow,* 64 N. Y. 411, where the article sold was described as "XX pipe iron." Held, there was a warranty of the character of the iron as "XX pipe iron," the holding being largely based upon *Hawkins v. Pemberton, supra.* The same point again came before the court of appeals of New York in the case of *White v. Miller,* 71 N. Y. 118, 27 Am. Rep. 13. The article there sold was described as "Large Bristol Cabbage." Held, an implied warranty that the seed sold was of that character and variety. Mr. Justice Andrews, in the opinion of the court, says:

"The doctrine that a bargain and sale of a chattel of a particular description imports a contract or warranty that the article sold is of that description, is sustained by a great weight of judicial authority. The cases of *Seixas v. Woods* (2 Caines, 48), and *Swett v. Colgate* (20 J. R., 196), based mainly upon the authority of the case of *Chandelor v. Lopus*

(Cro. J., 4), are, it must be admitted, adverse to this view. The case of *Chandelor v. Lopus* has been overruled in England, and the cases in this state referred to have been often questioned, and Chancellor Kent, who took part in deciding *Seixas v. Woods*, intimates in his commentaries a doubt whether the case was correctly decided. (2 Kent. 479). . . We think the modern doctrine upon the subject is reasonable, and proceeds upon a just interpretation of the contract of sale. A dealer who sells an article describing it by the name of an article of commerce, the identity of which is not known to the purchaser, must understand that the latter relies upon the description as a representation by the seller that it is the thing described; and this constitutes a warranty."

We next refer to cases from other states, to show that the rule of the English and New York courts has become the settled American rule. In *Flint v. Lyon*, 4 Cal. 17, the sale was of "Haxall" flour; it turned out to be "Gallego" flour, it further being shown there was no difference in the value of "Gallego" and "Haxall" flour. Held, the use of the word "Haxall" amounted to a warranty that the flour was Haxall. In *Peckham v. Davis*, 93 Ala. 474, 9 South, 509, the article sold was a "soda water apparatus with safety valves." The article delivered had no safety valves, and although it appeared that safety valves were not indispensable to the efficiency of such apparatus, it was held to be an implied warranty that the apparatus had safety valves attached.

"If not a warranty strictly speaking, but a condition, as held by some authorities, failing to answer the description, it is not the thing purchased, and the buyer has the right to return the article."

In *Wolcott, Johnson & Co. v. Mount*, 36 N. J. L. 262, 13 Am. Rep. 438, the article sold was "early strap-leafed red-top turnip seed." The seed was shown to the buyer. It turned out to be another kind of turnip seed. The court says:

"The doctrine that on the sale of a chattel as being of a particular kind or description, a contract is implied that the

article sold is of that kind or description is also sustained . . . whether the action shall be technically considered an action on a warranty, or an action for the nonperformance of a contract, is entirely immaterial."

In *Whitaker v. McCormick*, 6 Mo. App. 114, the article sold was described as "No. 2 white mixed corn." Nothing was said about a warranty. The testimony showed, as in the case at bar, that the term "No. 2 white mixed corn" was specifically descriptive of a particular grade. Held, an implied guaranty that the article sold, when delivered, shall be of the particular description. In *King v. Rochester*, 67 N. H. 310, 39 Atl. 256, the articles sold were valves of a certain pattern manufactured at Boston. Valves of a similar character manufactured at Pittsburg were furnished, which was shown to be of equal value and usefulness. Held, that the buyer was not bound to accept them. In *Columbian Iron Works v. Douglas*, 84 Md. 44, 34 Atl. 1118, 57 Am. St. 362, 33 L. R. A. 103, the article contracted for was steel scrap consisting of clippings from the steel plates of cruisers built by defendant for the United States navy. Seventy tons of the delivered scrap were not such clippings. The opinion of the court reads in part as follows:

"The substitution of any other or different material, no matter what its quality or chemical test might be, was a clear breach of the undertaking entered into by the parties. When a person buys a particular thing he cannot be compelled to take some other thing, even if like the thing he bought. He has a right to insist on the terms of his contract. If he has unwittingly received that which he has not bought he has the right to return it, or, keeping it, to recoup when sued for the stipulated price, the damages which a failure to comply with the contract has caused him; or, finally, if he has paid the purchase price he has the legal right to sue for and to recover back the difference in value between the price which he has paid for an article he did not get, and the market price of the substituted article delivered to and retained by him."

Many other American cases might be cited to the same ef-

fect, but such citation would add little to the recognition or establishment of the rule here announced, and unduly lengthen this opinion.

We therefore hold that, in treating the words "Star A Star" in the nature of a condition precedent, or warranty, the court below was right, and its judgment is affirmed.

MOUNT, GOSE, PARKER, CROW, FULLERTON, and CHADWICK, JJ., concur.